Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    FORT WORTH DIVISION
 3
     ROBERT SMITH,                  )
 4                                  )
              Plaintiff,            )
 5                                  )
     VS.                            ) CIVIL ACTION NO.:
 6                                  ) 4:24-cv-00723
     CENTRAL MUTUAL INSURANCE       )
 7   COMPANY,                       )
                                    )
 8            Defendant.            )
 9
10
                 ------------------------------------
11
                     REMOTE ORAL DEPOSITION OF
12
                            GARY TREIDER
13
                         DECEMBER 10, 2024
14
                 ------------------------------------
15
16
17        REMOTE ORAL DEPOSITION OF GARY TREIDER, produced as
18   a witness at the instance of the DEFENDANT, and duly
19   sworn, was taken in the above-styled and -numbered cause
20   on December 10, 2024, from 9:07 a.m. to 3:40 p.m.
21   Central Time, via Zoom, before Mercedes Arellano, CSR in
22   and for the State of Texas, reported by machine
23   shorthand, pursuant to the Texas Rules of Civil
24   Procedure in Dallas County, Texas, pursuant to the
25   Federal Rules of Civil Procedure.
       Job No. CS7027360
```

**EXHIBIT BB**

Page 2

1    REMOTE APPEARANCES
2
3 FOR THE PLAINTIFF:
4    Clifford K. Nkeyasen
     CLIFFORD K. NKEYASEN PLLC
5    4310 North Central Expressway
     Suite 103
6    Dallas, Texas 75206
     (469) 249-9271
7    (469) 249-9113 (fax)
     clifford@coveragedenied.com
8
9
10 FOR THE DEFENDANT:
11   Clinton J. Wolbert
     PHELPS DUNBAR, LLP
12   910 Louisiana Street
     Suite 4300
13   4300, Texas 77002
     (713) 626-1386
14   (713) 626-1388 (fax)
     clinton.wolbert@phelps.com
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            INDEX
2                            PAGE
3 Appearances                  2
4 Proceedings                  4
5
6 GARY TREIDER
7    Examination by Clinton J. Wolbert    4
8
9 Signature and Changes       160
10 Reporter's Certificate     162
11
12
            EXHIBITS
13
   NO.  DESCRIPTION           PAGE
14
   1  July 27, 2023 Chaparral Consulting   69
15    and Forensics report
16 2  Supplemental discovery              80
      Bates Treider 1601 through Treider 1622
17
   3  May 12, 2022 Donan report          124
18
   4  Bates stamped Treider 1547         153
19
20
         ***EXHIBITS RETAINED BY MR. WOLBERT***
21
22
23
24
25

Page 4

1            PROCEEDINGS
2       THE STENOGRAPHER: We are now on the record
3  for the Zoom deposition of Gary Treider on
4  December 10th, 2024, at 9:07 a.m.
5         Will the attorneys please state their
6  name and who they represent.
7         MR. NKEYASEN: Clifford Nkeyasen on behalf
8  of the Plaintiff, Trevor Smith.
9         MR. WOLBERT: And Clinton Wolbert and
10 Will de los Santos on behalf of Central Mutual Insurance
11 Company.
12            GARY TREIDER,
13 having been first duly sworn, testified as follows:
14            EXAMINATION
15 BY MR. WOLBERT:
16   Q. All right. Good morning, sir.
17      How are you today?
18   A. Wonderful.
19   Q. Good, good.
20   A. -- for about two or three hours just to take
21 something from my (indiscernible).
22   Q. Yeah. Okay. All right. We went on the
23 record. My name's Clint Wolbert. I'll be taking your
24 deposition today, okay?
25   A. Okay.

Page 5

1    Q. You already gave us your name for the record.
2        Could we have your date of birth, please?
3    A. July 1st, 1953.
4    Q. And where do you currently reside?
5    A. In Midlothian at 2820 Clear View Drive,
6  Midlothian, Texas 76065.
7    Q. Okay. How long have you lived at that address?
8    A. Right at 30 years. It'll be 30 years this --
9  yeah, 30 years this year.
10   Q. Any plans to move from that address in the next
11 year or so?
12   A. No.
13   Q. I see you've been deposed a number of times in
14 the past?
15   A. Yes, sir.
16   Q. About how many times do you think?
17   A. In the last ten years -- this is just a guess,
18 but I'd say between 30 and 40 -- I turned in a -- a list
19 of depositions, and I think it's -- it's 30. It -- it
20 needs to be updated again. I've got two or three more
21 that need to be added for '24, but it has at least 30 on
22 it.
23   Q. Have you testified at trial previously?
24   A. Yes.
25   Q. Do you remember how many times you testified at

Page 58

1  Is that something you can look for as well
2 to provide to Mr. Nkeyasen?
3      A. Yes. There's bound to be -- I would think
4 there'd be emails with IFC and Blackstone. And
5 that's -- oh, and then also Clifford's law firm, but
6 that's going to be a whole thing, too, with any others.
7      Q. Okay. Okay.
8         Yeah, if you can provide the IFC and
9 Blackstone emails, we would appreciate that.
10     A. Okay.
11     Q. Okay. You mentioned that IFC had retained you
12 on some other roof claims that were in close proximity
13 to this property.
14        Do you remember that?
15     A. Yes.
16     Q. Do you remember how that came about?
17        Were these all part of a community, or
18 how -- or how that happened? Do you have any knowledge
19 of that?
20     A. I don't know the particulars; but typically,
21 anytime any of my clients call me, it's typically to
22 sort out the issues, address the extent of damage, and
23 what it would take to repair.
24        So I'm not sure what process that he was in
25 at that time. But on several different properties, I

Page 59

1 assume that they were all anticipated to need for an
2 expert report that had a claim turned down.
3      Q. Do you remember how many properties we're
4 talking about in the same vicinity?
5      A. About half a dozen --
6      Q. All right. And did you ever --
7      A. I'm sorry. Within the gated community.
8      Q. Yeah.
9         Do you remember the gated community's name?
10     A. No, sir.
11     Q. Did you draft reports for all of the properties
12 that you inspected?
13     A. I did for one or two. I think -- now, there
14 again, I don't follow these to see what happens after,
15 you know. Oftentimes, I don't get a call. I get a call
16 usually if there's a problem and we have to, you know,
17 go back and readdress something.
18     Q. Okay. But you remember drafting one or two
19 other reports other than for Mr. Smith?
20     A. I think there's -- there's at least one or two.
21 And there again, there's an awful lot of paperwork
22 across my desk. I couldn't remember for sure. I can
23 look it up. I will have a record on it.
24     Q. Okay. Do you know if any of those other
25 properties are in litigation?

Page 60

1      A. I have no idea. There's -- I don't use street
2 addresses. But let's see, there's a -- I mentioned some
3 locations, just by the street that they're on. King
4 Fisher, Post Oak, Night Hawk were some of the locations
5 that I inspected for the roofing company.
6      Q. All right. You mentioned that you live in
7 Midlothian, Texas, right?
8      A. Correct.
9      Q. How far away is that from Westlake?
10     A. I should know. My daughter lives in that area.
11        35 miles.
12     Q. Okay. Do you have any personal knowledge of a
13 hailstorm that occurred on April 28th, 2021?
14     A. Yes. I -- every time there's a new hailstorm,
15 I'm going to have some kind of involvement. I'll get a
16 call from -- and if it's a big storm, I'll get a call
17 from somebody.
18     Q. And have you had other files opened as a result
19 of the April 28th, 2021, storm?
20     A. I'd have to go back and research it. When we
21 get an assignment, we establish if the reported date of
22 loss is reasonable. And then once we do that, then we
23 just move on to the issues about scope and cost.
24     Q. And you didn't personally experience the
25 hailstorm, right?

Page 61

1      A. No. There's evidence of it -- very clear
2 evidence of it on site, but I was not there.
3      Q. Okay. Were you told anything specific about
4 the extent of the damage that Mr. Smith claimed occurred
5 at property?
6      A. Not that I recall.
7      Q. Do you know when Mr. Smith made his insurance
8 claim to Central Mutual?
9      A. No.
10     Q. Okay. Were you asked to determine, whenever
11 you were first retained, when the damage occurred to the
12 property?
13     A. Well, the -- I was aware of the storm occurring
14 in that general area and the intensity of the storm.
15 And I'm sure Mr. Mayfield mentioned the date of loss
16 early on. But this was the big storm in that area, so I
17 assumed that -- I'm sure early on, I assumed that was
18 it. And I didn't get any objections to using that date.
19     Q. Okay. So it wasn't as if you determined on
20 your own when the storm actually occurred.
21        This is what you were told -- you were told
22 by the policyholder?
23     A. No. The -- we always run the records just like
24 everybody else does, but we determine if it hailed and
25 the frequency of large and small hailstones, shape of

Page 66

1 months after that date; is that right?
2   A. There again, I can confirm the metadata, but
3 that sounds about right.
4   Q. All right. So you have no actual knowledge
5 yourself of what the roof looked like prior to
6 April 28th, 2021.
7     Is that fair to say?
8   A. Other than -- the little details that we looked
9 for would not be as obvious to someone just walking up
10 from the street, but I didn't have any information that
11 indicates that this roof was in bad shape prior to the
12 date of loss. In our visual observations, it appeared
13 to be well-maintained.
14   Q. All right. You didn't have any information the
15 roof was in bad shape prior to the date of loss.
16     Do you have any information to suggest the
17 roof was in good shape prior to the date of loss?
18   A. Well, it depends upon where that came from if I
19 would trust the data or not. If someone makes a very
20 specific statement to say, "Well, we just replaced the
21 roof last year," then it's -- you know, "Never had a
22 leak," then that would be one category.
23     But generally speaking, property owners
24 don't really remember that much detail about their
25 roofs. And I have to be very careful with any loss,

Page 67

1 including large commercial losses, tenants, property
2 owners. They simply don't -- they've got other matters
3 to deal with, and they don't remember most of the
4 details.
5   Q. Right. And my question is: Do you have any
6 information that the roof was in good condition prior to
7 April 28th, 2021?
8   A. I don't have anything either way, other than
9 what I've already stated.
10   Q. Okay. All right.
11     Do you remember how many times you
12 personally had been to this property?
13   A. Two that I recall. Could have been more. I
14 have technicians on site at each location. We evaluate,
15 and I'll check, you know, periodically the progress.
16 This one was relatively simple and wouldn't require the
17 number of stops that it normally does for commercial
18 or...
19   Q. Do you know who -- well, let me withdraw that.
20     Did you use a technician on this
21 property?
22   A. One of the technicians was my son. He -- I
23 don't recall if I had anybody else there, but I know he
24 was there.
25   Q. All right. Was he there with you at all times,

Page 68

1 or did he go by himself ever?
2   A. My technicians are rarely there with me unless
3 I'm requiring assistance on cutting samples or something
4 very specific. They're there to document the property
5 from the ground up, all evidence of hail impact, and get
6 that thoroughly documented, which -- which he did.
7   Q. We saw several photos in your file, and we're
8 talking about 1500 pictures.
9     Are those photos that you took, or were
10 those taken by your son? Or is it a combination of
11 both?
12   A. The majority of photos -- almost all the photos
13 around the exterior of the house, you'll notice a wood
14 ruler. If you see a wood ruler in a photo, it was
15 definitely going to be one of ours.
16     Some of the other photos may have been
17 taken by the roofer, but his example starting out with
18 Photo -- Photo 4.1, 4.2 would have been ours. 4.3 might
19 have been provided by the roofer. 4.4 is ours. 4.5 is
20 probably ours, but could have been the roofer. 4.6 is
21 definitely ours.
22     4.7 is -- I can't say for sure. It could
23 be either way. 4.8 is definitely one of our photos.
24 4.9 is probably the roofer's. 4.10 is definitely ours;
25 it has the wood ruler, and so forth.

Page 69

1     The majority of photos are from our file.
2   Q. Okay. Let me just mark your report as
3 Exhibit 1.
4     (Exhibit 1 marked.)
5   Q. (BY MR. WOLBERT) And, sir, are you able to see
6 my screen?
7   A. I'm sorry. Yes, I can see my report.
8   Q. Okay. And you'll see this is a Chaparral
9 Consulting and Forensics report dated July 27th, 2023;
10 to Gary Pennington; regarding hail damage to clay tile
11 roof at 2211 Vaquero Club, Westlake, Texas; date of
12 loss, April 28th, 2021.
13     Is that all right?
14   A. Correct.
15   Q. And this is a 56-page report. Scrolling
16 through it here, does this appear to be your complete
17 report in this matter?
18   A. Yes. I think there was one photo that somehow
19 part of the photo swapped into -- if you look at the
20 very last page of the report, it has the last two pages
21 of the CoreLogic report for this project.
22     The first page of the CoreLogic report
23 is -- let me see here -- on Page 15. And I don't
24 know -- looks like the -- looks like the Adobe program,
25 it shuffled a little bit. The first page is 18. The

Page 106

1 file?
2   A. I don't know why it would be. I didn't find
3 anything that stood out to tell me that the CoreLogic
4 was completely off track on this one. And I could run
5 reams of paper for some of these reports that I get
6 into, but there's just no purpose in it. You know, the
7 purpose is to see if there's something that doesn't make
8 sense.
9   Q. Okay. Would you agree that there is both 2021
10 hail damage and damage that occurred on that roof from
11 prior to 2021?
12   A. Well, every roof -- well, probably 80 percent
13 of the roofs in the entire Dallas-Fort Worth Metroplex
14 had at least some hail on them in the last year to two
15 years. So, you know, it's a matter of how damaging hail
16 was.
17   Q. Okay. So is that a "yes" to my question?
18   A. The pattern of damage, the frequency --
19 frequency of smaller and larger hailstones, all of that
20 tied very closely to our observations into the data that
21 we obtained to prove it up one way or the other.
22   Q. But you agree there was damage that occurred on
23 that roof prior to 2021, right?
24   A. Not necessarily. It depends -- you know, there
25 could have been a hailstorm at that location that might

Page 107

1 have provided some minor chips.
2       The important issue -- and there's just so
3 much that an expert can do, but one thing that we can do
4 if we're doing our job, you find some surfaces to
5 compare how to -- Surface A versus Surface B versus
6 Surface C, is it about the same frequency and the same
7 number of large hail index. On this one, that's exactly
8 what we observed. It wasn't out of place.
9   Q. All right. Looking at the "Observation"
10 section of this report, it says: We evaluated several
11 roofs in the gated community where the subject property
12 is located that were damaged by the April 28th, 2021,
13 hailstorm.
14       Did I read that correctly?
15   A. Yes.
16   Q. Were you asked to do this by IFC Roofing for
17 all of those properties that you looked at?
18   A. As I recall, I think -- I think they gave us
19 the introduction to each one of these roofs originally.
20 And then I don't really know which ones were picked up
21 by the public adjusters. You know, sometimes the public
22 adjuster will get involved, and they very quickly get it
23 resolved, and the adjuster will either pay for it or
24 whatever. They get the claims going.
25       But I would have to assume that IFC Roofing

Page 108

1 was my first contact on every one of these.
2   Q. And whenever you did the roof evaluations, did
3 you do these all within the same proximity of time, or
4 were these separated by weeks and months?
5       Or can you explain how that worked?
6   A. The decisions were made on my first -- first
7 visit to that gated community. Getting in and out of
8 the gated community is not the easiest thing in the
9 world. You have to -- you know, have to have your
10 credentials in order.
11       Anyway, I believe all in one day, I think
12 we were on five roofs, I believe, if I recall, that
13 first day. And these -- I might have been on another
14 one, but with a return trip. But the return trips were
15 primarily by technicians to go back and get all the
16 detail shots.
17   Q. Okay. So sounds like for the roof evaluations,
18 you did them -- all the ones in this gated community
19 were done in a single day?
20   A. Well, my preliminary original observations,
21 yes, in a single day.
22   Q. All right.
23   A. Additional observations made, you know, you
24 don't have any senior consultants that get out there and
25 do all the minutia. In the first place, it's not fair

Page 109

1 to your client because you have to overcharge them. You
2 have to have well-trained technicians, and that's what I
3 use.
4   Q. Okay. You said that you were out here twice at
5 this property.
6       Do you remember the -- how long it was
7 between your first visit and your second first?
8   A. It wasn't a long time frame. It was over a
9 period of weeks or months. I mean, it wasn't like
10 years.
11   Q. Okay. And why did you go back out the second
12 time?
13       Do you remember?
14   A. Well, oftentimes, I just wanted to check and
15 see how my evaluations were going. You know, there's a
16 lot of things that you can be concerned over. Safety
17 issues, if you know a roof has a lot of rotten decking,
18 you know, that's -- I'm going to pay, you know, some
19 close attention to that because that can get somebody
20 hurt.
21       But there's all kinds of considerations.
22 Sometimes you find -- on your direct site observations,
23 you find something in one -- at one location within a
24 given community that is different than the other ones.
25 And then when you find that, then you got to find out,

Page 122

1  Q. Is this the Robert Smith house?
2  A. Well, I refer to it by the street address,
3  2211.
4  Q. Okay. But that's what this is?
5  A. Yes.
6  Q. Okay. Do you know when any of those dents
7  began to exist on the metal roof panels that we're
8  looking at?
9  A. Well, as I mentioned earlier, the most useful
10 issue for that particular photo or that particular
11 angle, it shows very heavy dents that are approximately
12 the same frequency that I've seen on other surfaces at
13 this property and other nearby properties -- other
14 nearby homes.
15 Q. Okay. Do you know when these dents began to
16 exist on the roof -- or on these metal roof panels?
17 A. Well, all that's important for me to say
18 that this is obviously the larges hail that's impacted
19 this property. And as I mentioned before, there might
20 have been some minor hail at some point in the past, but
21 these dents matched up with other observations.
22     So there's no reason to think that these
23 dents were not -- the vast majority of them, if not all
24 of them, were from the reported date of loss.
25 Q. Okay. And would you ever do any sort of

Page 123

1  analysis to determine when these particular dents began
2  to exist, or is that just a logical deduction on your
3  part?
4  A. Well, no, it's the way that any consultant that
5  knows what they're doing. The procedure -- the standard
6  procedure is you observe the field of damage and the
7  damage profile, no different than what NOAA uses for
8  damage profiles for tornados.
9  Q. Okay. Well, what did you -- what did you do to
10 determine any of these dents occurred on April 28th,
11 2021?
12 A. Well, as I said before, the dents, the
13 frequency of dents, and the number of large dents match
14 up to other observations made at this particular
15 residence and in close proximity.
16 Q. Okay. Is there anything else that you can add
17 as to what you did with your methodology for determining
18 the date of the dents, or is that the extent of it?
19 A. Well, that's really the only effective way of
20 doing it. There's some other things that can be tried
21 that aren't as effective, but the most effective is to
22 compare damage profiles for one area to another and to
23 see if they match up.
24 Q. Let me show you what we're going to mark as
25 Exhibit 3.

Page 124

1     (Exhibit 3 marked.)
2  Q. (BY MR. WOLBERT) And this is a 45-page report
3  prepared by Donan, with respect to the 2211 Vaquero Club
4  Drive property. This is dated May 12th of 2022.
5     Have you ever seen this report before?
6  A. I don't recall.
7  Q. All right. It was not in your file materials.
8     Does that indicate to you that you never
9  looked at this report?
10 A. There again, I might have been provided it when
11 I'm out on the road somewhere and just didn't get to
12 say, but I don't recall. I've looked at a lot of Donan
13 reports in the last few years.
14 Q. I'm sure, I'm sure.
15     So without having looked at this, you don't
16 have any particular opinion one way or the other about
17 whether Donan's conclusions or its analysis are correct
18 or incorrect?
19 A. There again, I haven't analyzed that report.
20 So I can do that and issue rebuttal if I'm requested to
21 do so.
22 Q. All right. Do you see here that there are --
23 there is some weather data here included? I believe
24 this is from Canopy.
25     Have you ever seen this data before?

Page 125

1  A. In various reports, this data is repeated over
2  and over and over again with all the hail reporting
3  programs. It doesn't mean that it actually hailed at
4  any particular location or did not hail at any
5  particular location. You have to go by site evidence to
6  determine that.
7  Q. Okay. And that's the case with CoreLogic as
8  well, right?
9  A. All of the weather reporting, including NOAA.
10 Q. Okay. You'll see here on May 24th, 2011, this
11 table indicates hail size of 2.75-inch occurred within a
12 one-mile radius of the subject location.
13    Do you see that there (indicating)?
14 A. Yes. I observed hail damage on at least 25 to
15 30 locations primarily working for Trevor Insurance
16 Company, and that was a very significant storm, not the
17 only one that happened that year, but very significant.
18    It doesn't mean that hail fell at any
19 specific location. I can say one thing. If the hail
20 was -- at that particular location was anywhere close to
21 2.75 inches, I would have been able to determine that
22 because some of the damage is going to be dated. That
23 storm -- that was a really different storm.
24    It -- the storm clouds move from the west
25 to the east most locations, not all, because I've

Page 126

1 investigated locations through -- of the whole north end
2 of Fort Worth, mid-cities through Dallas over into
3 Garland, Mesquite, that -- one of my pictures that I
4 show, a top of an air conditioner unit across from the
5 old Texas stadium, that was right there at 183
6 and -- well, 183 and Loop 12.
7         Now, that's an example of where that hail
8 was very, very large, but it wasn't that large
9 everywhere. I have no reason to believe that the hail
10 that large would have occurred at this property on
11 May 24, 2011, or I would have likely been able to detect
12 that.
13    Q. And how would you have been able to detect hail
14 from 2011 at that property?
15    A. Well, some of the hail in that storm was
16 considerably larger than 2.75. The -- one example was
17 the flight museum at the end of Love Field Airport. The
18 very, very significant hail -- hail dents that you
19 expect to see from like 3-, 3-and-a-half -- 3.7-inch
20 hail.
21         The only question here that this particular
22 document raises is, was there any evidence of 2.75
23 that's -- that was ten years old or better.
24         And no, the frequency of large dents in the
25 surfaces that I observed at this property and at other

Page 127

1 properties don't support hail other -- large hail other
2 than in this storm. I can't -- I can't say that there
3 wasn't some small hail, but I can say that there's no
4 evidence to conclude large hail impacted there.
5    Q. Well, I thought you said earlier that sometimes
6 these hail reports overstate the size of hail that falls
7 on a property; is that right?
8    A. There are times that they overstate; there are
9 times that they understate. You know, it depends upon
10 which hail report program you're looking at.
11         All of them tend to overstate at some
12 times. You know, it doesn't mean they're going to do it
13 every time, but there's none of them that are
14 site-specific accurate.
15         So I made no observations to conclude that
16 the May 24, 2011, storm was -- had any significant
17 impact on this property.
18    Q. But just so I understand your testimony
19 correctly, you didn't do anything to analyze a 2011
20 storm one way or the other whenever you were drafting
21 your report, right?
22    A. No. When we're out in the field, if you
23 notice, we take a lot of photographs. Well, that is --
24 there's a purpose for that. We're looking for evidence
25 of new and old hail. And there was a fair amount of

Page 128

1 time spent doing that, and we did not make any
2 significant observations for hail that could have been
3 ten years old.
4         The hail damage was -- according to
5 the -- you know, the size hail that we believe occurred
6 and we've proven occurred, and there's not a lot of old
7 dents. The -- it's like that awning, if it had twice as
8 many dents as we saw on the fence, then there would be a
9 reason to possibly suspect a former storm. But we
10 didn't see that.
11    Q. Well, how do you determine how old a dent is?
12    A. Well, it depends upon what the surface is. A
13 crust will go within a dent.
14         But I think you're missing my point. The
15 dents on fencing, on roofs, on concrete sidewalks,
16 spatter that still remains visible, all our observations
17 were in accord with hail that we know occurred on the
18 reported date of loss.
19         There's plenty of evidence to show that
20 there's been very significant hail at this location and
21 others. There's no evidence to support that a lot of
22 those dents appeared before because, in the first place,
23 they would probably be out of a different direction.
24         If I recall, the direction of hail for the
25 2011 storm in that particular area was more out of the

Page 129

1 east-northeast.
2    Q. How would you know that?
3         How would you know the direction of hail in
4 2011?
5    A. Well, I totaled more than $20 million in roofs
6 for that storm. So I think I can say I had a
7 significant amount of experience, site-specific
8 experience, throughout the Metroplex from the west side
9 of Fort Worth to the east side of Dallas.
10    Q. Okay. You never inspected this property with
11 respect to that storm, right?
12    A. No.
13    Q. Okay. And just so I understand -- I understand
14 what you're saying, that you might have been able to
15 tell if the hail dents were old, but you never actually
16 analyzed to rule out whether 2011 had anything to do
17 with the condition of the property; is that right?
18    A. Well, the -- what you're talking about's snake
19 oil. I like to -- I concentrate on the issues that we
20 can back up with direct physical evidence. There's all
21 kinds of theories out there. And you see all kinds of
22 opinions about what, you know, consultants or engineers
23 or architects or adjusters think may or may not have
24 occurred.
25         But if you read the evidence properly and

33 (Pages 126 - 129)

Veritext Legal Solutions

800-567-8658                                    973-410-4098

APPX 000269

Page 130

1  if you search for enough evidence -- and sometimes it
2  simply isn't enough at one location. You may have to
3  several locations you know were impacted by the same
4  storm.
5       But we were able to find enough evidence to
6  support the significant hail that occurred at this
7  location was on the reported date of loss and no other
8  date of loss.
9    Q. And what is that evidence?
10   A. Well, let's go back through my report again.
11   Q. All of that evidence would be in the report,
12  right?
13   A. Yes. There's photographs, and we have other
14  photographs that clearly show that the hail that
15  impacted, not this property, but every one that we
16  inspected was very jagged, large hail, not to say that
17  this property had the largest out of all of them.
18       And you really never know that for sure
19  because you may not have enough surfaces to inspect to
20  determine that one way or the other, but we include in
21  our report what we could stand behind and not -- we
22  don't treat conclusions frivolously.
23   Q. Okay. So we're looking for all the evidence
24  that this storm occurred in -- on April 28th, 2021, that
25  is in your report.

Page 131

1       What is that evidence?
2    A. Okay. Let me bring my report back up.
3       Here again, this is one of the most
4  important pictures that's up right now, the 4.7.
5    Q. 4.7?
6    A. Yes.
7    Q. This right here on Page 39 of your report
8  (indicating)?
9    A. Yes.
10   Q. Now, tell me why that's the most important
11  picture.
12   A. For a consultant that actually knows what
13  they're doing, it's either going to match the pattern of
14  damage that you've seen otherwise on the same property
15  or in close proximity, and it did. There's no reason to
16  suspect that a large percentage of this could have
17  existed before the storm, but that's just one example.
18  I have others.
19   Q. Yeah, I'm trying to understand how you get to
20  that conclusion, and I'm not -- I'm not sure how you do
21  so. I see dents. I saw -- you know, you refer to other
22  properties in this neighborhood that you also inspected.
23  You said that other houses were not affected.
24       How do you -- I just don't understand what
25  the link is between these dents and April 28th, 2021.

Page 132

1    A. Well, you misstated. I didn't say that none of
2  the other houses were affected.
3    Q. I said, "Not every house was affected."
4    A. I didn't say "Not every house was affected." I
5  didn't look at every house.
6       (Simultaneous conversation.)
7    Q. (BY MR. WOLBERT) Was every house affected?
8    A. This is -- I wouldn't know.
9    Q. Okay.
10   A. I would have no reason for trying to obtain
11  that information. You have to use reason and
12  commonsense with this, and that means you do what needs
13  to be done.
14   Q. Okay.
15   A. Then you don't just, you know, bill -- you
16  know, billable hours on it.
17   Q. So you're saying every single dent that we're
18  seeing in this photograph occurred on April 28th, 2021?
19   A. No, that's not what I said.
20   Q. How many of those dents occurred on April 28th,
21  2021?
22   A. I've already addressed that, but I'll address
23  it again.
24   Q. Please do.
25   A. The largest dents are the most significant

Page 133

1  because that is the -- most of the work, the significant
2  degree of damage. So we work backwards from that.
3  Okay. We have a number --
4    Q. Let me make sure -- let's make sure you're
5  answering my question.
6       How many of these dents occurred on
7  April 28th, 2021?
8    A. There's no consultant that could give you an
9  answer to that, other than what I'm saying. We have a
10  certain way that we address physical evidence, and I've
11  already been over that. I'm willing to go over it again
12  if you want me to.
13   Q. No. I heard your testimony earlier.
14      But so logically, from what your knowledge
15  is, it could be 5 percent, it could be 90 percent of
16  these dents occurring on April 28th, 2021. You don't
17  specifically know?
18      Is that fair to say?
19   A. No, that's not what I said, and that's not --
20      (Simultaneous conversation.)
21   Q. (BY MR. WOLBERT) What percentage of dents
22  occurred in Photograph 4.7 on April 28th, 2021?
23   A. No consultant's going to be able to give you a
24  precise answer other than what is reasonable. And what
25  is reasonable, the pattern of large dents matches the

34 (Pages 130 - 133)

Page 134

1  subject storm and not another date.  There wouldn't --
2  you wouldn't have the same -- I see the same thing over
3  and over again on surfaces that are being repainted,
4  surfaces that are being replaced.
5       But if you just look at the -- it's a
6  relatively new air conditioner in Photo 4.6 --
7       (Simultaneous conversation.)
8    A.  -- that had to have occurred back in 2021.
9    Q.  (BY MR. WOLBERT)  Sir, we're looking at
10  Photograph 4.7.  What -- I'm trying to see if you have
11  any -- can you -- if the jury is going to go back into
12  the -- into the deliberation room and say, "I want to
13  allocate however many percentage of dents is on this
14  metal panel that occurred on April 28th, 2021," how
15  would they do that?
16       MR. NKEYASEN:  Objection, form.
17    A.  Well, I've already gone over that several times
18  now.
19    Q.  (BY MR. WOLBERT)  If you say so.  I haven't
20  heard you say --
21       (Simultaneous conversation.)
22    A.  It has to be presented to the jury so they can
23  make an informed decision based upon the physical
24  evidence.
25    Q.  (BY MR. WOLBERT)  And how do you do that?

Page 135

1    A.  My report does exactly that.  It doesn't leave
2  anything out.  You know, a -- and you can't make experts
3  out of a jury overnight.  You can't just sit them down
4  with an expert report, and they can pretend that they're
5  an expert in hail investigations.
6       But we can point out issues that just
7  commonsense leads you to believe the dents on this
8  surface that's on the screen right now are comparable
9  damage to what we see on many of the surfaces.
10   Q.  Every dent?
11   A.  No.  I've already -- I've already -- this is
12  the maybe tenth time answering that question, but I
13  don't mind it.
14   Q.  Yeah.
15   A.  I can't tell you that every single little dent
16  had to come from this storm.  There could have been
17  some, you know, smaller hail.  I didn't find any
18  evidence of it.  And we looked -- we looked thoroughly,
19  and I think we would have found it.
20       But at least on one of these properties
21  that we just -- this property, there could be more of a
22  question.  Maybe there was -- there's more surfaces that
23  we might have been able to find, but we had plenty of
24  surfaces to compare the damage profile in that
25  particular photo, 4.7, to the other areas where, you

Page 136

1  know, surfaces were damaged and everything from fencing
2  to metal panels, manufactured tile.  You know,
3  everything -- everything fits as would be expected.
4       We didn't run into anything that we said,
5  "Well, we need to go back and spend another day or two."
6  We spend any amount of time we have to when it's
7  reasonable, but we don't spend it when it's not
8  reasonable.
9    Q.  If there were another storm maybe ten years
10  earlier than this date of loss with the exact same size
11  of hail, would you be able to determine what hail
12  occurred in 2021 versus ten years earlier?
13   A.  I don't know what kind of report you're
14  referring to because none of those reports actually
15  confirm hail at any location.
16   Q.  I'm asking a question.  I'm just asking a
17  question generally.
18   A.  Uh-huh.
19   Q.  If there was evidence that there was hail the
20  same size ten years earlier than the date of loss, would
21  you be able to tell what hail occurred in 2021 versus
22  ten years earlier?
23   A.  Usually I can, and it depends upon the surface.
24  It depends upon the types of material.
25       (Simultaneous conversation.)

Page 137

1    A.  Okay.  Well, if you're going to ask a question,
2  you really should give me a chance to answer it.
3    Q.  (BY MR. WOLBERT)  Well, I want you to answer
4  it --
5    A.  Different materials will weather -- the hail
6  spatters or scuffs will weather differently.  You're not
7  going to have wood fence scuffs that's going to last
8  over five years.  It's going to fade back out typically
9  anywhere from two to five years, but they're certainly
10  not going to last eight to ten years.
11       So, you know, we made no observations to
12  conclude that there was any more work that needed to be
13  done.  We had enough to take a firm stand that the
14  20- -- the subject storm was the one that caused the
15  vast majority of this damage.  We can't say every little
16  ding, especially on a copper surface, but we can say
17  that the vast majority of it, the large dents match up
18  perfectly with the hail profile.
19   Q.  And when you say "hail profile," I don't know
20  that I've ever heard your definition for what a "hail
21  profile" is.
22       Tell me what that is.
23   A.  Well, the reason you haven't heard it is
24  because you haven't been to my seminars; and there
25  again, they've been given them from the east coast to

Page 138

1  the west coast.
2      Q. I'm just here for the depo, not for seminars.
3      A. Okay. First-party claim, and you name it,
4  the -- excuse me.
5          Give me the question again.
6      Q. What is a "hail profile"?
7      A. Oh, yeah. Hail profile.
8          "Hailstone profile" refers to the qualities
9  or characteristics of individual hailstorm --
10 hailstones. One of the programs that I participate in,
11 we have what we call a hail chasing vehicle, which is a
12 van that pulls a trailer that has about $100,000 worth
13 of equipment in it, everything that we need to test hail
14 realtime.
15         So we follow alongside the tornado chasers,
16 and we pick up hailstones off the ground. Then they are
17 retained in the trailer, which has a -- it's climate
18 controlled. We keep it around 15 degrees.
19         So those stones don't change any until we
20 get them tested, and there's a half a dozen different
21 tests that we perform on them. So that's one example of
22 how to determine if hail can cause damage or not.
23         But the most important on just a typical
24 investigation -- we've already covered this, but if
25 you'll look on Page 4.6, that couldn't dent -- the

Page 139

1  dent -- the fan guard did not happen ten years ago.
2  That air conditioner didn't exist ten years ago.
3      Q. But that air conditioner could be put into
4  place?
5      A. Well, the dents on these -- on these window --
6  at least this is photos --
7      Q. I thought -- we're still talking about the AC,
8  4.6, you pointed me to that one.
9          How do you know when that dent existed?
10     A. Well, 'cause the air conditioner is not ten
11 years old.
12     Q. How old is the air conditioner?
13     A. Well, it's less than ten years old. The screws
14 started getting rusty. The wire cages starting to get
15 rusty. There's some distinct -- the paint fades. You
16 know, it's not reasonable to assume that that AC would
17 have been that old.
18     Q. Okay.
19     A. Now, if you look at the photos of the window
20 frames -- this goes back to 4.1. Again, some of these
21 dents -- if you look at the dent on 4.1, you can see a
22 little bit of the spatter. They're still a little bit
23 hard to see. We really need to take the -- if we want
24 to cover it thoroughly, we need to take the original
25 photo.

Page 140

1          But if we blow that up, we're going to be
2  able to see a spatter. And there again, that's very
3  large hail. Anytime you have hail that will cause a
4  dent to a heavy window frame like that, that is very
5  significant hail.
6          4.2, same thing.
7      Q. Let me ask you some questions here.
8          Let's try to -- let me get through my
9  questioning, and we can talk about this here in a little
10 bit.
11     A. Uh-huh.
12     Q. How many of these clay tiles were damaged on
13 the roof?
14     A. The percentage that had at least some nicks
15 was -- and I quoted about 50 percent. The amount that
16 you would have -- and there again, we're talking about
17 having extensive experience working with roofing
18 companies.
19         There are some roofing companies that you
20 might have only 20 percent waste, and some of them you
21 might have 40 percent waste. But there's going to be
22 some breakage. There's going to be some tile that
23 recognize -- some of those tiles have cracks that it's
24 hard to see and it won't show up, you know, for possibly
25 two or three more years.

Page 141

1          But all in all, half the tile have damage
2  that I would be concerned about freestyle. And in order
3  to repair these roofs, it would require rack-and-stack,
4  which would cause fairly significant additional damage
5  based upon experience.
6      Q. So you're saying more -- you're saying half of
7  the tiles had -- had damage on them?
8      A. Yes, half, at least some nicks --
9          (Simultaneous conversation.)
10     Q. (BY MR. WOLBERT) Okay.
11     A. -- surface, either the corners or in the field
12 of shingles.
13         Now, there again, I'm referring to the --
14 these nicks where you can actually see an imperfection
15 or a damage spot or multiple spots. I guess I'll bring
16 it up.
17     Q. Let me ask you a question here.
18         ==Do you know whether -- do you know what==
19 ==percentage of those dents or those dings on the clay==
20 ==tiles were the result of a hailstorm on April 28th,==
21 ==2021?==
22     ==A. Well, based upon direct observations, there==
23 ==were very few -- there -- you will always have a few==
24 ==imperfections. But the photo I have up right now of==
25 ==5.2, it's very obvious that this is directional hail.==

36 (Pages 138 - 141)

Page 142

1  It didn't occur on the left side of these. It occurs on
2  the right side. That's directional.
3         And the tile in 5.3, this happens to be in
4  an area or -- and/or a tile that was a little more
5  susceptible. You notice when you look at the surface of
6  the tile, you know, they're still in serviceable
7  condition, but they're not in perfect condition.
8         These are just like top shingles on a roof
9  or wood shingles on a roof. Over time, they deteriorate
10 to a certain extent. Some of these tiles will be more
11 susceptible to having dents. But on this one little
12 tile right here (indicating), that's 2, 4, 6 -- that's
13 8, 9 -- the one on the corner could be a larger
14 hailstone corner break or a rounder hailstone. The
15 other ones had to be from jagged hail.
16    Q. And we don't know when that occurred, right?
17    A. Yeah, it occurred on the reported date of loss.
18    Q. And how do you know that?
19    A. We followed the evidence.
20    Q. How does the evidence lead you to that
21 conclusion?
22    A. We found no evidence that we could -- excuse
23 me -- conclude anything else. Everything leads to this
24 storm caused the damage at this property.
25    Q. All right. And do you -- do you identify that

Page 143

1  methodology in your report anywhere?
2     A. Well, the procedures that I go through and the
3  thought process I go through might fill a small
4  encyclopedia. That's not necessary.
5     Q. Okay.
6     A. I try to put in my report what anybody would
7  need, an average person, just an individual property
8  owner, an adjustor, the -- whoever is reviewing the file
9  at the insurance company, a contractor. Anybody reading
10 my reports, if they really want to see the evidence, can
11 read and understand the report. They don't have to read
12 it four or five times to try to understand it.
13    Q. But just so I understand, your methodology is
14 not included in your report; is that right?
15    A. Oh, yes. It starts on the first page and ends
16 on the last page.
17    Q. Well, it's not -- it doesn't lay out how you
18 determined any of this occurred on April 28th of 2021,
19 from what I can see, unless you can point me to where
20 that is?
21    A. Oh, yes, it does. It absolutely --
22    Q. Tell me where to look to see that.
23    A. Well, there again, we have to look at some of
24 the photos.
25    Q. Well, I'm looking right at -- the report I'm

Page 144

1  talking about, not the photographs. The actual --
2     A. The photos are part of the report, Counselor.
3     Q. I understand. The -- hold on, sir. Hold on.
4  Let me -- let me talk here.
5     A. Okay.
6     Q. Are you saying that the methodology is not in
7  the written report, it's only in the photographs?
8     A. I'm saying that the methodology that I use is
9  used throughout the report, and I don't use a lot
10 of -- include a lot of nonsense in the report trying to
11 brag on, you know, how -- what I do is different than
12 what anybody else does.
13        What I do is proven over time. If you'll
14 look at page -- at the Photo 3.4, the scuffs that are
15 made there are significant scuffs. That's not made by
16 small hail. Only the largest hail will make those.
17    Q. And that's --
18    A. In that area, that's probably -- let's just say
19 where all y'all's circles are, that's maybe 15 square
20 feet. Well, there's two, three, four, five, six, seven,
21 eight, nine, ten, eleven -- more than ten significant
22 scuffs in a 15-square foot area. That's about what I
23 would expect to see. It's not going to be that
24 everywhere.
25        But this is the kind of evidence that if we

Page 145

1  had old hail on at least some of the surfaces I've
2  looked at, there'd be evidence of older hail, and we
3  didn't see that.
4     Q. You didn't see any evidence of any older hail
5  on this roof?
6     A. Well, in that neighborhood. And I have to
7  include the neighborhood because I try to follow NOAA's
8  instructions on how to do this properly. And they
9  believe in evaluating the debris shields in the -- track
10 the storm.
11        All these photos, looks like, is an example
12 including one in 3.1. Very clearly the hailstone had at
13 least one, two, three, four, five, six points of
14 hailstone impact. Most of them in Photo 3.4, at least
15 several points, and some of them have as many as six or
16 seven points of impact.
17    Q. Well, how many --
18    A. The evidence that we've looked for, and it's
19 basically the only evidence you can use. The weather
20 reports are useless, as far as if you're trying to be
21 site specific.
22        And I can write a very lengthy report and
23 include weather reports from every one of the weather
24 reporting services if somebody wants to pay me to do so.
25        Weather reports are just general

37 (Pages 142 - 145)

Page 146

1 information. You have to rely upon direct evidence
2 observed on site, and that's what we did.
3     Q. And are you saying that there is -- the only
4 hailstorm that had jagged hail at this property was on
5 April 28th, 2021?
6     A. Well, there was no evidence of a recent
7 hailstorm where there was jagged hail. And when you
8 have jagged hail, there's -- it's just like in the photo
9 we just went over -- very specific evidence to prove
10 that the hail was either jagged or round. In this case,
11 it was jagged.
12     Q. Okay. And tell me again what that evidence is.
13     A. Well, the photo I have up right now. I have a
14 Photo 3.4 in my report.
15     Q. Photo...
16     A. Photo 3.4 in my report.
17     Q. Okay. This is a property at Night Hawk Court?
18     A. Right.
19     Q. All right. Now, how is this evidence that
20 there was jagged hail at the property?
21     A. Well, if you notice the -- I need to bring my
22 photo up a little closer.
23         Starting from the top to the bottom of the
24 scuffs that are obvious from jagged hail, one, two,
25 three, four, five -- and that's the ones that are

Page 147

1 obviously for jagged hail. Jagged hail may only contact
2 one surface of the hailstone.
3         The -- what we look for -- if you'll look
4 in the middle of that photo, there's three circles that
5 have -- the one on the right-hand side has four points
6 of contact. The next one has five points of contact.
7         On the left-hand side, they have at least
8 three points of contact. That's typical for jagged
9 hail. You're going to -- most of it, you're going to
10 see multiple points of contact.
11     Q. Okay.
12     A. Now, you can say roughly half of these had
13 multiple points of contact, which can only come from
14 jagged hail. It can't come from -- as long as you
15 establish the pattern, that doesn't come from just round
16 hailstorm stones.
17     Q. And do you know how many other storms at that
18 property over the past ten years had jagged hail?
19     A. No. Nobody knows how many storms occurred at
20 that property period unless they have direct physical
21 evidence to support that statement.
22     Q. Okay. And I believe that you testified
23 that -- or you put in your report anyway, that the roof
24 should be replaced due to hail damage that occurred on
25 April 28th, 2021; is that right?

Page 148

1     A. Correct.
2     Q. Why does the roof need to be replaced or
3 repaired?
4     A. Well, the deterioration will occur over time.
5 They will -- eventually will start seeing a freestyle
6 because when you allow moisture to get in these tile,
7 that freezes, it flakes off pieces of the tile.
8         We all heard about the Mexican brick back
9 in the 1970s. The only way you could keep the brick
10 from falling off your house was to spray it. You had to
11 seal it. If you didn't seal it, every year spalling
12 would occur. Eventually, like on a fireplace, the whole
13 fireplace would fall down.
14         Well, the hail is something that -- I
15 know we've already talked about this, but half of the
16 storms are going to have jagged hail. But when you ask
17 specific questions about how many places jagged hail
18 impacted, the only way I can tell you that is where I've
19 made actual inspections and there's always going to be
20 because there we find it.
21     Q. Okay. Have you -- who is the manufacturer of
22 these tiles?
23         Do you know?
24     A. It's printed on the back of the tile. I
25 don't -- I don't have that photo up now, but it's

Page 149

1 definitely a Mexican tile.
2     Q. Okay. Did you do anything to determine if
3 those tiles are still available?
4     A. There -- there should be some tile available on
5 the -- oh, it's from the tile yards. There was a fair
6 amount of this tile used. If there would be enough to
7 do this house, that just depends upon when you put an
8 order in. That could be enough today and after another
9 hailstorm, or maybe this last hailstorm we had, they may
10 be completely out.
11     Q. Okay.
12     A. If it was a minor repair, we could probably
13 find some tile to repair. You're likely looking at
14 replacing -- replacing 50 percent that are -- that are
15 dimensionally damaged and another anywhere from 20 to
16 40 percent.
17         So your savings could be fix them all to,
18 you know -- and that would be with rack-and-stack
19 operation, but you still have to take all the tile off.
20     Q. So aside from the cost to do so, would it be
21 possible to simply replace the tiles that were damaged
22 rather than replace the whole roof?
23     A. Well, if these were concrete tile, that would
24 be fairly simple.
25     Q. What about this type of tile?

Page 154
1 attempt a partial.
2   Q. And were some of those tiles damaged during
3 installation?
4       Did any of them have wear and tear or other
5 causes of damage other than hail?
6   A. Well, you shouldn't have wear-and-tear damage.
7 After they're installed, they should have painters that
8 are on the roof with ladders that are inappropriate for
9 contractors that are, you know, dropping tool bags, that
10 sort of thing.
11      For the most part, a -- one of these roofs,
12 once it's installed, if it isn't impacted by hail or
13 damaged by wind, there shouldn't really be very much of
14 that surface damage. And what I observed on these,
15 there again, the most important thing is, it is
16 directional. It can't be just because of a freestyle.
17   Q. Were there conditions on those tiles that were
18 caused by something other than hail?
19   A. Well, you're always going to have -- there
20 might have been a tree that's been cut down that had a
21 branch that fell on one of the tile. There's always
22 going to be incidental things like that.
23      There may be, you know, some tile that were
24 broken from a -- a contractor might have some minor wind
25 damage to ridge tile. There again, I don't -- I don't

Page 155
1 know what the history of this roof has been, and most
2 property owners can't tell you what the roof's been
3 through.
4       But I did not see evidence of an excessive
5 amount of surface damage to these tile. What I saw was
6 a fresh result of jagged hail.
7   Q. And do you agree that there was no evidence of
8 any tiles being fractured like in the photograph of your
9 hail cannon?
10   A. I didn't understand the question.
11   Q. So we looked at a photo in your report. I'll
12 show it to you here. These are photos -- I'll pull this
13 up -- back to probably Exhibit 2.
14      Photo 6.1, this is a clay tile before
15 firing a hail canon. And then 6.2, the clay tile
16 fractured right in half.
17      Do you see that?
18   A. Right.
19   Q. Did you see any evidence of any clay tiles
20 being fractured in half like in this Photograph 6.2?
21   A. There are some that are broken. One of my
22 report photo shows -- let's see. Do you see pieces
23 of -- this is Photo 5.2? You see pieces of tile in the
24 top left -- I'm sorry -- top right corner of the
25 picture?

Page 156
1       (Simultaneous conversation.)
2   A. Yeah, those are pieces of tile that are broken.
3 Something had to cause that at the -- and it's there for
4 a number of years, like ten years. Your little (Zoom
5 interruption) -- are typically going to fall off.
6       The 5.1 has a half little broken rooftop.
7 But the primary damage to these tile is not an
8 occasional tile that's broken, but tile that have been
9 damaged and will continue to deteriorate if they're not
10 replaced.
11   Q. The cause -- well, tell me how that works.
12   A. Just like the Mexican brick, if the water is
13 able to penetrate through the finish on the -- you know,
14 the top of the tile, if water can get through that into
15 the tile, you have freestyle action, water enters, it
16 freezes, it makes a fracture larger, and over time will
17 degrade the rooftop.
18   Q. Is that like a marring issue?
19   A. A mild issue?
20   Q. Marring.
21   A. I'm sorry. I didn't understand. A what issue?
22   Q. I said "marring," M-A-R-R-I-N-G?
23   A. Marring?
24   Q. Is it a marring issue?
25      Is that what you're describing?

Page 157
1   A. No, no. A marring issue would be like on some
2 of these tiles, you can tell where people had been
3 getting up on the roofs, have a little bit of -- you can
4 call it scuffs, marring, whatever you want to call it,
5 but just some little scuffs on the surface of the tile.
6 But that's not damage. That's not going to cause
7 deterioration in the future.
8   Q. Okay.
9       MR. WOLBERT: Sir, I think this is a good
10 time to take 10, and I will be in a position to wrap up
11 here very quickly.
12      Cliff, I don't know that we got your
13 supplement yet, though.
14      MR. NKEYASEN: No, yeah, you haven't gotten
15 it because -- Gary, obviously, we've been here talking,
16 but the email files are corrupt. I mean, I don't know
17 if it's on our end or your end, but we can't open them
18 to do anything with them, so...
19      THE WITNESS: I can go back and print them
20 to -- let's make it 15 minutes, and I'll take each one
21 of them and print them to a PDF. The attachments won't
22 be there, but y'all have the attachments anyway. So I
23 can fix that in 5 to 10 minutes.
24      MR. NKEYASEN: Okay.
25      THE STENOGRAPHER: The time is 3:14 p.m.

40 (Pages 154 - 157)

Page 158

1  We are off the record.
2       (Break taken from 3:14 p.m. to 3:38 p.m.)
3       THE STENOGRAPHER:  The time is 3:38 p.m.
4  We are back on the record.
5    Q.  (BY MR. WOLBERT)  Okay.  Sir, have you ever
6  seen a report written by Jordan Beckner of Roof Tech
7  Engineering?
8    A.  I'm not recognizing the name, but I worked
9  with -- for years with Steve Patterson that owned that
10 company.  I don't use their -- I referred a lot of
11 business to him.  I don't refer any business to him now.
12   Q.  Okay.  Did you ever -- just so I understand,
13 though, you never saw Jordan Beckner's report that
14 includes his opinions with respect to the property in
15 this case?
16   A.  I don't recall seeing it, no.
17   Q.  What about a report by someone named
18 Bryan Hash?
19       Have you seen Bryan Hash's report with
20 respect to this property?
21   A.  No.
22   Q.  And all of the information that you've been
23 provided with respect to this property is contained in
24 the claim file documents that you've sent over to
25 Mr. Nkeyasen; is that correct?

Page 159

1    A.  Yes.  I'll check it one more time.  But as far
2  as I am aware, that's everything I had.
3    Q.  All right.  Have you been asked to do anything
4  else with respect to this case?
5    A.  No, not for now.
6    Q.  Have you understood all my questions today?
7    A.  Yes.
8    Q.  And have you answered truthfully and correctly?
9    A.  Yes.
10   Q.  Okay.  So those are all the questions I have.
11 Thank you very much for your time.
12       Mr. Nkeyasen may ask you questions; he may
13 not.
14       MR. NKEYASEN:  Well, we'll reserve our
15 questions for trial.
16       MR. WOLBERT:  Okay.
17       THE STENOGRAPHER:  Mr. Nkeyasen, do you
18 need a copy of the transcript?
19       MR. NKEYASEN:  Yes, E-tran.
20       MR. DE LOS SANTOS:  The time is 3:40 p.m.
21 This concludes the Zoom deposition of Gary Treider.
22       (Remote deposition concluded at 3:40 p.m.)
23
24
25

Page 160

1       CHANGES AND SIGNATURE
2  WITNESS NAME: GARY TREIDER    DATE: DECEMBER 10, 2024
3  PAGE LINE    CHANGE         REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Job No. CS7027360

Page 161

1       I, GARY TREIDER, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6       _____
7       GARY TREIDER
8
9  THE STATE OF _____)
10 COUNTY OF _____)
11
12   Before me, _____, on this day
13 personally appeared GARY TREIDER, known to me (or proved
14 to me under oath or through _____)
15 (description of identity card or other document) to be
16 the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed the
18 same for the purposes and consideration therein
19 expressed.
20   Given under my hand and seal of office this
21 _____ day of _____, _____.
22
23
       _____
24     NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
25     COMMISSION EXPIRES: _____

Job No. CS7027360

```
                                                              Page 162
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 2               FORT WORTH DIVISION
 3   ROBERT SMITH,       )
                         )
 4        Plaintiff,     )
                         )
 5   VS.                 ) CIVIL ACTION NO.:
                         ) 4:24-cv-00723
 6   CENTRAL MUTUAL INSURANCE )
     COMPANY,             )
 7                        )
          Defendant.      )
 8
 9   ----------------------------------
10         REMOTE ORAL DEPOSITION OF
11               GARY TREIDER
12            DECEMBER 10, 2024
13   ----------------------------------
14
           CERTIFIED STENOGRAPHIC
15
         COURT REPORTER'S CERTIFICATE
16
17       I, Mercedes Arellano, Certified Shorthand Reporter
18   in and for the State of Texas, hereby certify to the
19   following:
20
21       That the witness, GARY TREIDER, was duly sworn by
22   the officer and that the transcript of the oral
23   deposition is a true record of the testimony given by
24   the witness;
25       That the amount of time used by each party at the
        Job No. CS7027360
```

```
                                                              Page 163
 1   deposition is as follows:
 2       CLIFFORD K. NKEYASEN - 00 HOURS:00 MINUTE(S)
 3       CLINTON J. WOLBERT   - 03 HOURS:49 MINUTE(S)
 4
 5       That pursuant to information given to the
 6   deposition officer at the time said testimony was taken,
 7   the following includes counsel for all parties of
 8   record:
 9       Clifford K. Nkeyasen, Attorney for Plaintiff
10       Clinton J. Wolbert, Attorney for Defendant
11
12       I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   ... not financially or
16   ... outcome of the action.
17   ... irements pursuant to Rule
18   ... ed to after they have
19
20   ... 0th day of January, 2024.
21
22   _____
     Mercedes Arellano, Texas CSR 8395
23   Expiration Date: January 31, 2026
     VERITEXT LEGAL SOLUTIONS, Firm No. 571
24   300 Throckmorton Street, Suite 1600
     Fort Worth, Texas 76102
25   (817) 336-3042   (800) 336-4000
        Job No. CS7027360
```



```
                                                              Page 164
 1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2       The deposition transcript was submitted on
 3   _____ to the witness or to the attorney
 4   for the witness for examination, signature and return to
 5   me by _____;
 6       The original deposition was/was not returned to the
 7   deposition officer on _____;
 8       If returned, the attached Changes and Signature
 9   page contains any changes and the reasons therefor;
10       If returned, the original deposition was delivered
11   to Clinton J. Wolbert, Custodial Attorney;
12       That $_____ is the deposition officer's
13   charges to the Defendant for preparing the original
14   deposition transcript and any copies of exhibits;
15       That the deposition was delivered in accordance
16   with Rule 203.3, and that a copy of this certificate was
17   served on all parties shown herein on and filed with the
18   Clerk.
19       Certified to by me this ___ day of _____, 2024.
20
21
22   _____
     VERITEXT LEGAL SOLUTIONS
23   Firm No. 571
     300 Throckmorton Street
24   Suite 1600
     Fort Worth, Texas 76102
25   (817) 336-3042   (800) 336-4000
        Job No. CS7027360
```

```
                                                              Page 165
 1   Gary Treider
 2             January 10, 2025
 3   RE: Smith, Robert v. Central Mutual Insurance Company
 4   DEPOSITION OF: Gary Treider 7027360
 5       The above-referenced witness transcript is
 6   available for read and sign.
 7       Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11       The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14       According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18             Yours,
19             Veritext Legal Solutions
20
21
22
23
24
25
```